IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| ALFONSO WELLS, ) | |
| 242 Short Branch Rd. ) | |
| Stafford, VA 22556 ) | |
|     Plaintiff, ) | Case Number: |
| ) | |
| v. ) | |
| ) | |
| AMAZON DATA SERVICES, INC. ) | |
| 410 Terry Ave, N ) | |
| Seattle, WA 98109-0000 ) | |
|     Defendant. ) | |

## **COMPLAINT**
(Trial by Jury Demanded)

COMES NOW, Plaintiff Alfonso Wells ("Plaintiff"), by and through undersigned counsel, and hereby submits his Complaint for damages against Defendant Amazon Data Services, Inc. ("Defendant"). In support of, Plaintiff states as follows:

## **PARTIES**

1. Plaintiff is an adult resident citizen of Virginia, residing at 242 Short Branch Rd., Stafford, VA 22556.

2. Defendant Amazon Data Services, Inc. is a corporation with its registered office located at100 Shockoe Slip FL 2, Richmond, VA 23219-4100 and its principal place of business located at 410 Terry Ave., N, Seattle, WA 98109-0000.

## **JURISDICTION AND VENUE**

3. This action is being brought pursuant to 28 U.S.C. Section 1331, 28 U.S.C. Section 1343(a)(3) and 42 U.S.C. Section 1981 and includes any and all federal law claims plead herein for which jurisdiction and venue is attached.

4. Supplemental jurisdiction is further proper pursuant to 28 U.S.C. § 1367 in that Plaintiff's other claims are so related to the claims which this court has original jurisdiction that they form part of the same case.

5. Venue is proper in this district, pursuant to 28 U.S.C. Section 1391 because substantial part of the events and omissions giving rise to this claim occurred in this judicial district.

## ADMINISTRATIVE REMEDIES

6. On July 22, 2019, Plaintiff filed charges of discrimination with the Equal Employment Opportunity Commission.

7. The EEOC conducted an investigation on Plaintiff's claim. On March 3, 2020, the Equal Employment Opportunity Commission issued a dismissal and notice of right to sue.

8. The Complaint is being filed within ninety (90) days of the Plaintiff' receipt of the Notice of Right to Sue. Plaintiff has complied with all statutory and administrative prerequisites to filing suit.

## FACTS

9. Plaintiff was employed by Defendant Amazon Data Services, Inc.

10. Amazon Data Services, Inc. is a subsidiary of Amazon Web Services, Inc.

11. Amazon Data Services, Inc. offers reliable, scalable, and inexpensive cloud computing services to individuals, companies, and governments.

12. Amazon Data Services, Inc. is headquartered in Seattle, Washington, and employs more than 550,000 employees worldwide.

13. Amazon Data Services, Inc. has a Data Center in Manassas, Virginia, where Plaintiff was employed.

14. Plaintiff was hired on March 28, 2016 as Rack Decom Datatech in the Ashburn, VA location.

15. Plaintiff was later transferred to the Manassas, VA location.

16. Plaintiff was responsible for decomming and the destruction of media drives.

17. Plaintiff was terminated from his position on July 15, 2019.

18. Amazon Data Services, Inc.'s allegation is incorrect.

19. The media destruction process requires a two-person verification team.

20. Destroying media without a partner for a two-person verification team is strictly prohibited.

21. During the media destruction process, the two-person verification team will first electronically (often referred to as "logical" or "logically") destroy the media drives.

22. After the media drives has been logically destroyed, the two-person verification team will physically destroy the media drives using a degausser.

23. Amazon Data Services, Inc. alleges that Plaintiff failed to strictly adhere to Amazon Data Services, Inc.'s media structing Standard Operating Procedures ("Media Destruction SOPs") multiple times in a six-month period.

24. First, it should be noted that the Media Destruction SOPs cited by Amazon Data Services, Inc. as its reasoning for terminating Plaintiff was not the same Media Destruction SOPs provided to Plaintiff.

25. Plaintiff followed the policies exactly as they were written.

26. Further, for every incident which Defendant alleged Plaintiff violated, he received expressed authority from his immediate superior.

27. In fact, Plaintiff conferred and received approval from his immediate superior prior to each of the alleged actions used against Plaintiff in his termination.

28. It was only after receiving approval did Plaintiff act accordingly.

29. Despite receiving approval, Defendant used these incidents in support of if its illegal termination of Plaintiff.

30. Defendant cites three isolated in which it used to make its determination to terminate Plaintiff.

31. The first incident occurred on or about January 15, 2019.

32. Defendant alleged that Plaintiff confirmed that he destroyed certain media drives and transferred the media drive to an electronic waste container.

33. It was later found that the media drive was actually still in the degausser and had not been placed in the electronic waster container.

34. In this circumstance, Plaintiff followed the policy provided to him by Amazon Data Services, Inc. for the media destruction

35. Plaintiff worked with his "two-person verification" partner for the destruction process.

36. As Plaintiff performed the logical destruction of the media drive and performed the required media drive counts, Plaintiff's partner performed the physical destruction of the media drives.

37. Plaintiff's partner then placed the media drives in the degausser and initiated the physical destruction process.

38. Both Plaintiff and his partner believed that all of the drives had been sufficiently destroyed.

39. However, it was discovered that one drive still remained in the degausser.

40. Notably, it is very common for media drives to be left in the degausser as the degausser sometimes has an unpredictable delay.

41. Media drives are found under the belt and within the crusher of the degausser at one point on a weekly basis because they cannot be seen without a flashlight.

42. Nevertheless, the media drives were erased.

43. To combat the delay, employees typically allow the degausser additional time to clear so that the chance of a drive being left in the degausser is minimized.

44. The process of allowing additional time to clear is not a process included in the degaussing manual nor is one that always yield one hundred percent media drive destruction.

45. While Defendant used this incident as support in its determination for Plaintiff's termination, Defendant notably did not write Plaintiff up nor provide Plaintiff a warning.

46. Plaintiff received only an email suggesting that he be more careful.

47. Plaintiff's partner for that day did not receive a warning or write up.

48. It should be noted that another team on the same day left a drive on the floor.

49. Further, while Plaintiff worked with his partner for the destruction process, it was in fact Plaintiff's partner who was tasked with the physical destruction of the media drive.

50. Plaintiff's partner was personally responsible for the media drive being left in the degausser.

51. Yet, Plaintiff was left with the blame for the incident because the media drive was last attached his electronic ID in the logical destruction process.

52. When the media drives are physically destroyed, they do not remain linked to the last person who electronically accessed them.

53. In this case, Plaintiff was the last person to electronically access the media drive that was found because he had to electronically destroy the drive.

54. The second incident in which Defendant used as a factor in its determination to terminate Plaintiff occurred in February 2019.

55. Defendant alleged that during the destruction process, a media drive that Plaintiff scanned did not match the media drive that was destroyed.

56. Defendant believed that when the discrepancy occurred, Plaintiff should have immediately reported the discrepancy so that the proper team can conduct an investigation into the problem and correct it.

57. This procedure is accounts only for when one discrepancy occurs.

58. However, in this case there were numerous media drives that had been misscanned.

59. The bins were full of misscanned media drives.

60. These media drives were scanned using the wrong serial number.

61. Based on Plaintiff's experience, rather make a separate help ticket for each misscanned drive, Plaintiff knew it would be more effective to organize all of the misscanned drives into one stack and one ticket.

62. This allowed for the next individual to handle the misscanned drives to operate with ease when handling the drives as they could look at one ticket instead of hundreds of tickets.

63. Plaintiff was asked why he did not report ore escalate the incident to leadership.

64. However, Plaintiff did escalate the incident to his lead.

65. It was in fact Plaintiff's lead who failed to properly investigate the matter.

66. Despite following proper procedure, Plaintiff received coaching for this incident and was informed to place drive on individual help tickets moving forward.

67. Again, Plaintiff received no written or final warning for this incident.

68. The incident which lead to Plaintiff's termination occurred on June 3, 2019.

69. Defendant alleged that during the process of destroying 867 media drives, the rolling cart where the drives were being placed was jostled and media drives fell onto the floor.

70. Plaintiff and his partner recounted the media drives a second time after picking up the media drives off the floor.

71. However, one of the media drives had not been retrieved and was not discovered until July 7, 2019.

72. Defendant alleges that Plaintiff and his partner did not complete the second scan to confirm the count as required by the media destruction standard operating procedures.

73. Defendant further alleges that Plaintiff's action of electronically destroying the media drives before physically destroying the media drives is possibly what let to him not realizing the media drive was missing.

74. During the media destruction process that day, Plaintiff's partner had to leave and Mr. Wells was preparing for his break.

75. According to Defendant's media destruction standard operating procedures, media destruction requires a two-person verification team.

76. If one team member is unavailable for the destruction process, standard operating procedures require the team handling the media drives to transfer custody to another two-person verification team that can continue with the media destruction.

77. Plaintiff and his partner transferred custody of the media drives to the next available two-person verification team.

78. Specifically, Plaintiff and his partner transferred custody of the two-person verification team consisting of Patrick O'Keefe and Sean Geserick.

79. Ryan Weatherfold was also present when Plaintiff and his partner physically transferred custody to O'Keefe and Geserick.

80. O'Keefe and Sean already waiting on standby because they were aware that Plaintiff and his partner were going to be unable to complete the destruction as a team.

81. Because Plaintiff had already electronically destroyed the drives, he was unable to shift custody to the other team.

82. To remove a media drive from your custody, you must destroy the media drive or transfer into a media bin.

83. On this day, there were no media drive bins available at IAD55.

84. The only available bin was an SSD bin.

85. The only choice Plaintiff had was to destroy the media drives.

86. If Plaintiff would have logically placed the media dries into the media bin to remove from his custody, it would have been a misrepresentation on his part.

87. O'Keefe and Sean continued with the physical destruction of the drives.

88. On or about July 7th, 2019, a data technician found a drive on the floor that was believed to have been destroyed in the June 3, 2019 destruction event.

89. An investigation was conducted into all five employees.

90. Despite all five employees being equally involved, Plaintiff was the only employee terminated while the other four employees received written warnings.

91. Plaintiff's partner, Weatherford, O'Keefe, and Sean are all similarly situated Caucasian males.

92. Plaintiff was the only African American in the group.

93. Defendant placed the blame for the missing drive on Plaintiff because the custody was last listed under his name.

94. Despite the fact that Plaintiff and his partner had transferred the media drives to the next two-person verification team pursuant to the standard operating procedures.

95. The second two-person verification team consisting of O'Keefe and Sean held the responsibility to ensure that each drive had been accounted for and destroyed.

96. O'Keefe and Sean should have been held accountable for the missing drive.

97. However, based on the technicality that the drives remained under Plaintiff's electronic custody, despite being physically transferred to O'Keefe and Sean, Plaintiff was subjected to unequal treatment and terminated.

98. Notably, Plaintiff received had received a raise shortly before his termination despite the allegations made against him.

99. Defendant has a history of subjecting its African American employees to unequal treatment and favoring its Caucasian employees.

100. Specifically, on one occasion O'Keefe left a bin filled with media drives unlocked overnight.

101. Pursuant to Defendant's policy, all bins containing media drives are required to be locked in the appropriate storage facility.

102. O'Keefe negligently left for the day without ensuring all media bins were locked.

103. O'Keefe's gross negligence left Defendant exposed to the possibility of a severe data breach.

104. Employees had to go through each media bin and count the drives one-by-one to account for the all of the media drives.

105. Pursuant to Defendant's Standard of Conduct, gross negligence, gross misconduct, or intentional disregard of instructions are regarded as extremely serious and termination of employment may result.

106. There is no doubt that O'Keefe's action constituted either gross negligence, gross misconduct, or intentional disregard of instructions.

107. Nonetheless, O'Keefe did not receive a write-up, written warning, or even coaching for this incident.

108. In a separate incident, a media drive left the building in a rack with media on it.

109. The employee responsible for this incident is Caucasian.

110. A media drive leaving the building is a major violation of Defendant's policy due to the inherent security risk. The employee did not receive any warnings.

111. More telling is the employee recently received a raise from Defendant.

112. There have been numerous complaints to Defendant's human resources department regarding the way some of its manager have been berating, belittling, and humiliating its African American employees.

113. An investigation into complaints lodged against Defendant will show a history and pattern of racism, discrimination, and unequal treatment against the African American men and women that Defendant employs.

114. There is also a history and pattern of Plaintiff's immediate supervisor Bryan Pandolfi-Malone displaying a behavior of racism, discrimination, and unequal treatment against African American men and women under his supervision.

115. Pandolfi repeatedly yelled, humiliated, and belittled Plaintiff and other African American employees.

116. Pandolfi routinely lied to human resources and superiors about Plaintiff's conduct alleging that Plaintiff committed acts that he did not do.

117. On one occasion, Pandolfi lied to human resources that Plaintiff had a history of bad attendance.

118. However, Plaintiff only missed days of work when he had prior approval and proper notice to his superiors.

119. He further made a statement to Plaintiff that he his absences were affecting the Defendant's throughput.

120. Around this time, a number of similar situated Caucasian employees were absent from work an egregious number of times without notice or prior approval.

121. However, Plaintiff was the only person singled out.

122. On another occasion, Pandolfi lied to human resources stating that Plaintiff was asleep while on duty.

123. Human resources questioned Plaintiff as to whether he was asleep on duty.

124. It was discovered that when Plaintiff was found asleep, he had clocked out for lunch and was off duty.

125. Plaintiff is not the only employee in which Pandolfi has intentionally created a hostile working environment because of his race.

126. A closer look into Pandolfi's history with Defendant will show that Pandolfi has a history and pattern of creating a hostile working environment for most African American employees under his supervision.

127. There is a clear vendetta and bias that Pandolfi has against Plaintiff and other employees of color.

128. Pandolfi's actions were so severe and pervasive that they altered the work environment for Plaintiff.

129. Plaintiff had to constantly be on guard for Pandolfi and continuously rebut false allegations that being raised against him by Pandolfi to the extent that it made it difficult to do perform his duties.

130. Pandolfi's actions against Plaintiff and other African American employees was clearly done with the intent of creating a harsh and hostile work environment for Plaintiff and other African American employees.

131. Further, Pandolfi's actions display a clear intent make false allegations against Plaintiff and other African American employees so that he can have the terminated.

132. This is evidenced by the three incidents, in which Plaintiff received no warning or write-up, Pandolfi supplied to human resources to support Defendant's decision to terminate Plaintiff.

133. This is further evidenced by the numerous lies Pandolfi supplied to human resources about Plaintiff's actions.

134. Pandolfi displays a clear bias and prejudice against Plaintiff and African American employees.

135. Numerous complaints regarding his treatment of African American employees have been reported, both written and verbally, against him internally with Defendant.

136. Nonetheless, Defendant has failed to institute any action against Pandolfi to protect its African American employees.

## CAUSES OF ACTION

### COUNT I: RACIAL DISCRIMINATION: DISPARATE TREATMENT

137. Plaintiff hereby realleges all of the foregoing paragraphs as if fully restated herein.

138. Plaintiff is an African American male.

139. Plaintiff is a member of a protected class who was subjected to disparate treatment because of his race in violation of Title VII of the Civil Rights Act of 1964.

140. Plaintiff was employed by Defendant as a Rack Decom Datatech.

141. On July 7, 2019, a media drive was discovered to have been missing after a media destruction event.

142. There were five employees involved in this media destruction event, including Plaintiff.

143. Of those five employees, Plaintiff was the only African American employee.

144. The other similarly situated employees were Caucasian.

145. Prior to the completion of the media destruction event, Plaintiff and his partner transferred physical custody of the media drives to the next two-person verification team.

146. The new two-person verification team were then in possession of the media drives and thereby responsible for the ensuring all drives were accounted for and sufficiently destroyed.

147. The new two-person verification team failed to ensure that all drives were accounted for and sufficiently destroyed.

148. Due to the failure of the new two-person verification team, a media drive was found to have not been destroyed.

149. Because Plaintiff had already electronically destroyed the media drive, it was still found to be under his custody when it was scanned.

150. It was impossible to transfer to custody to the new two-person verification team when the physical transfer occurred because the media drive had already been electronically destroyed.

151. Because the media drive was found to be under Plaintiff's custody, he was placed at blame.

152. Arguably, the second two-person verification team had more involvement with the destruction of the media drive.

153. Nonetheless, Plaintiff was the only employee terminated for this event.

154. The four similarly situated Caucasian employees received only a write up.

155. Notably, two of the Caucasian have received big promotions since the incident.

156. The act and violation of Defendant resulted in a knowing, willful, and international violation of Plaintiff's rights guaranteed under Title VII of the Civil Rights Act of 1964.

157. As a direct and proximate result of Defendant's unlawful and discriminatory conduct toward Plaintiff, Plaintiff has lost wages, potential earnings, and sustained other pecuniary loss.

158. Defendant's history of racist and discriminatory practices, insults, contempt, and disdain have ben demoing to Plaintiff and have caused him, and others, to suffer deep pain, humiliation, anxiety, and emotional distress.

159. The unlawful actions of Defendant complained above were intentional, malicious, and taken in reckless disregard of the statutory rights of Plaintiff.

### COUNT II: RACIAL DISCRIMINATION: HOSTILE WORK ENVIRONMENT

160. Plaintiff hereby realleges the forgoing paragraphs as if fully stated herein.

161. Plantiff is an African American male.

162. Plaintiff is a member of a protected class who was subjected to disparate treatment because of his race in violation of Title VII of the Civil Rights Act of 1964.

163. Plaintiff was employed by Defendant as a Rack Decom Datatech.

164. Plaintiff's manager Pandolfi routinely yelled, berated, and humiliated Plaintiff during his employment.

165. Pandolfi routinely lied to human resources and superiors about Plaintiff's conduct.

166. Pandolfi's conduct was so severe and pervasive that it altered the working environment for Plaintiff.

167. Because of Pandolfi's actions, Plaintiff had to always be on guard as Pandolfi displayed a clear bias and prejudice against Plaintiff and other African American employees because of their race.

168. It was clear that Pandolfi had clear motive and intent to have Plaintiff terminated which is evidenced by the numerous lies Pandolfi made about Plaintiff.

169. This was further evidenced by continuous and routine acts of yelling, berating, and humiliating Plaintiff during his employment.

170. Finally, this is evidenced by Pandolfi's action of supply Defendant with three incidents in which Plaintiff received no write-up or warning as support for termination.

171. Notably, Plaintiff received had received a raise shortly before his termination despite the allegations made against him.

172. The act and violation of Defendant resulted in a knowing, willful, and international violation of Plaintiff's rights guaranteed under Title VII of the Civil Rights Act of 1964.

173. As a direct and proximate result of Defendant's unlawful and discriminatory conduct toward Plaintiff, Plaintiff has lost wages, potential earnings, and sustained other pecuniary loss.

174. Defendant's history of racist and discriminatory practices, insults, contempt, and disdain have ben demoing to Plaintiff and have caused him, and others, to suffer deep pain, humiliation, anxiety, and emotional distress.

## COUNT III: NEGLIGENCE

175. Plaintiff hereby realleges the foregoing paragraphs as if fully stated herein.

176. Defendant has a duty to protect its applicants and employees from discrimination in hiring, promotion, discharge, pay, fringe benefits, job training, classification, referral, and other aspect of employment, on the basis of race, color, religion, sex (including pregnancy), or national origin.

177. Defendant breached its duty by failing to protect Plaintiff from being discharged on the basis of his race.

178. This breach is evidenced by Plaintiff and the four similarly situated Caucasian employees being equally involved the event that led to Plaintiff's termination.

179. Of the five employees involved, Plaintiff was the only employee terminated.

180. Plaintiff is African American.

181. The other four similarly situated employees are Caucasian.

182. The four similarly situated Caucasian employees received write-ups.

183. Defendant directly and proximately caused Plaintiff to be damaged as a result of Defendant's negligence.

184. Defendant suffered damages including, but not limited to, lost wages, loss of potential earnings, lost benefits, mental distress, and humiliation.

## RELIEF

185. Plaintiff requests that the Court issue the following relief:

   a) Enter declaratory relief declaring that Defendant have engaged in race discrimination and constitutional violations under 42 U.S.C. Section 1981;

   b) Award Plaintiff compensatory and punitive damages for all the mentioned causes of action in an amount to be determined by a jury of his peers;

   c) Award Plaintiff attorney's fees, cost and expenses of litigation; and

   d) Award such other relief to which Plaintiff may be entitled to under law.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff demands judgment against Defendant in an amount exceeding the jurisdictional requirements of this Court, all together with Court costs, including attorney's fees, plus pre and post judgment interest, and for any other relief which this Court deems just and proper.

Respectfully submitted this 4th day of June 2020.

*/s/ Alexander Taylor*
Alexander Taylor
1622 W Main St.
Richmond, VA 23220
804-239-9232
Fax:866-446-6167
alextaylor@alextaylorlaw.com